UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

City of Cincinnati,                          :     Case No. 1:12-cv-104
                                             :
          Plaintiff,                         :
                                             :
vs.                                          :
                                             :
Deutsche Bank National Trust Co., et al,     :
                                             :
          Defendants.                        :

**ORDER**

Before the Court are the motions for partial summary judgment filed by the City of Cincinnati (Doc. 138), and for summary judgment on all claims filed by Defendant Wells Fargo Bank, N.A., and Wells Fargo Bank as Trustee (Doc. 139).  Both motions are fully briefed and ready for decision.

**FACTUAL BACKGROUND**

The factual and procedural history of this case are well-known to the parties, and were discussed in the Court's October 10, 2012 Order concerning Defendants' motions to dismiss the City's complaint.  (See Doc. 61)  As a brief overview, the City filed its complaint against several Deutsche Bank entities and Wells Fargo Bank, N.A., in both their individual corporate capacities and as "Trustees."  (Doc. 18)  The latter refers to the banks' roles as trustees of various residential mortgage-backed securitization ("RMBS") trusts.  The City generally sought injunctive and declaratory relief and damages against all of the Defendants, alleging that they owned residential properties within the City, and engaged in "unlawful public nuisance property maintenance business practices" with respect to those properties.  The properties that are or were

owned by the banks either outright or as trustees, are vacant "problem buildings" that were the subject of repeated orders, citations, and code violation notices issued by the City.  Despite notice of these orders and violations, Defendants failed to respond and did not appear in enforcement actions brought by the City.  The complaint included claims under several sections of the Cincinnati Municipal Code; statutory public nuisance claims; common law public nuisance claims challenging Defendants' business practices; a declaratory judgment claim; a claim for intentional interference with the City's fiduciary public trust duties; and a free-standing claim for punitive damages.

Defendants moved to dismiss, raising a number of arguments in support.  The Court dismissed three Deutsche Bank non-trustee entities after concluding that the complaint failed to allege a plausible claim against them.  The Court dismissed the City's common law nuisance damage claims, finding they were barred by the economic loss doctrine and because the City failed to show that Defendants' conduct proximately caused the alleged damages.  The Court permitted the City to proceed on those claims only to the extent that the City sought injunctive or declaratory relief with respect to specific identified properties.  Claims Six and Seven of the complaint alleged statutory nuisance claims, which may only be brought against the property owner.  Defendants argued that they did not own the properties identified by the City, and that the City failed to specifically allege the identity of a particular trust that may have owned the properties at some point.  The Court denied Defendants' motion to dismiss these claims, stating that the parties should cooperate to identify properties that are or were owned by any of the Defendants in any capacity.  With regard to the identity of the specific RMBS trusts, the Court held:

-2-

> [T]he Court finds that it is not fatal to the City's complaint that it did not include the full name of the specific trust that owns or owned any of the properties.  The full names of those trusts are very likely known to (or more easily ascertained by) the Trustees. ... The Trustees also claim that they are not responsible for trust-owned properties because unnamed servicers are responsible for property maintenance.  They submit excerpts from some of the "Pooling and Servicing Agreements" filed with the SEC by several of the securitization trusts for which a Deutsche Bank entity acts as trustee. ... These unnamed servicers are not, to this Court's knowledge, identified in any property title documents, and these agreements do not confer property ownership on the servicers.  As the Trustees repeatedly contend, statutory nuisance claims are properly directed at owners, not parties with whom those owners may have contractual relationships regarding maintenance responsibilities.

(Doc. 61 at 17)  The Court also denied Deutsche Bank's motion to dismiss Claims One through Five, alleging violations under the City's Municipal Code, rejecting the argument that the Deutsche Bank entitles did not own any of the identified properties.

The parties then engaged in a lengthy period of attempts to resolve disputes about identified properties, and conducted discovery on the remaining issues.  On May 4, 2015, the Court granted the City leave to file a third amended complaint, which eliminated claims about specific properties that the parties had resolved, and added additional properties allegedly owned by the Defendants.  (Doc. 111)  At that time, the parties continued to disagree about whether the City could properly sue Wells Fargo Bank "as Trustee" of unidentified securitization trusts.   By the end of 2015, the City had resolved all issues concerning all Deutsche Bank properties, and the Court dismissed the claims against the Deutsche Bank entities with prejudice.  (Doc. 129)   The City and Wells Fargo then filed their respective motions for summary judgment.

## ANALYSIS

I.     The court "shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An assertion of an undisputed fact must be supported by citations to particular parts of the record, including depositions, affidavits, admissions, and interrogatory answers. The party opposing a properly supported summary judgment motion "'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (internal quotation omitted).

The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc., 276 F.3d 845, 848 (6th Cir. 2002). Once that occurs, the party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989).

The burden is on the non-moving party to "present affirmative evidence to defeat a properly supported motion for summary judgment...," Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir. 1989), and to designate specific facts in dispute. Anderson, 477 U.S. at 250. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Industries Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The court must assess "whether there is the need for trial — whether, in other words, there are any genuine

factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250.  "If the evidence is merely colorable, ...  or is not significantly probative, ... the court may grant judgment." Anderson, 477 U.S. at 249-50 (citations omitted).

The court construes the evidence presented in the light most favorable to the non-movant and draws all justifiable inferences in the non-movant's favor.  United States v. Diebold Inc., 369 U.S. 654, 655 (1962).

II.     Wells Fargo raises one argument that can be quickly put to rest.  Its argues that any claim asserted against it in its own capacity (that is, other than as a trustee for a specific RMBS trust) must be dismissed, because the City has no evidence that it was personally at fault for any of the alleged violations on any of the properties.  The City's response memorandum clearly states that the issue of the bank's personal, non-trusteeship liability has been determined in Wells Fargo's favor by prior Court orders and the parties' stipulations.  The City's only remaining claims are against Wells Fargo in its capacity as an RMBS trustee.  See, e.g., Doc. 146 at 10: "... the City readily concedes that Wells Fargo's personal individual liability is no longer at play in this case." The Court's discussion of the balance of the parties' arguments is therefore limited to claims against Wells Fargo in its capacity as Trustee of an RMBS trust.

III.    There are 20 properties that remain in dispute, which the City identifies in its motion.  Each of these properties was once owned by and titled to Wells Fargo as Trustee of an RMBS trust.  The City lists the address of the property; the dates during which Wells Fargo as Trustee was the titled owner; the specific type of  code violations against those properties (civil fines, barricade costs, vacant building license fees, and

private lot weed/litter abatement fees, categories that correspond to Counts One through Four of the Third Amended Complaint); the dates that liabilities for those violations were incurred; and the amount owed with respect to each property.  (Doc. 138 at pp. 4-7, PAGEID 8486-8489)  The City seeks a judgment of $40,367.06 for all of its claims against these 20 properties.  Exhibits A through V to the City's motion are packets of documents that pertain to each of the 20 properties.[1]  The City asks the Court to take judicial notice of the following documents included in those exhibits:

(1) Exhibits A-1 to V-1, which are orders confirming the sheriff's sale of each of the properties to Wells Fargo as Trustee of an RMBS trust, and which were  entered in foreclosure actions filed by Wells Fargo in the Hamilton County, Ohio Court of Common Pleas.

(2) Exhibits A-2 through V-2, which are "Real Property Conveyance Fee Statements of Value and Receipt" for each of the properties, each completed by an agent or representative of the grantee of the property following the foreclosure sale. Ohio Rev. Code 319.202 requires a property grantee to submit this form to the County Auditor whenever title to the property changes hands.  The form identifies the grantor, the grantee, its permanent mailing address and tax billing address, along with other information about the property.  The forms completed by a representative or agent of Wells Fargo for the transfers involving the properties at issue identify the grantee in several different ways, including "Wells Fargo Bank, NA," or " Wells Fargo Bank N.A. as TR."

---

[1] There are no exhibits P and Q.

(3) Exhibits A-3 through V-3, documents entitled "Transfer History" for each property, which the City states are available on (and were apparently printed from) the Hamilton County Auditor's website.  These documents have columns labeled "Deed Book," "Page," "Sale Price," "Sale Date," "Previous Owner," and "Current Owner."   The deed book and page columns on Exhibits A-3 to V-3 are blank.

As an example of these exhibits, Exhibit L contains documents pertaining to 3735 Cass Avenue.  Exhibit L-1 is a September 20, 2007 court order confirming the August 30, 2007 Sheriff's sale to "Wells Fargo Bank, National Association, as Trustee for certificateholders of Bear Stearns Asset Backed Securities Trust 2005-1, Asset-Backed Certificates, Series 2005-1."  The property conveyance form (Exhibit L-2) completed by that entity was signed by its representative, April A. Brown on January 11, 2008, and identifies the Grantee as "Wells Fargo Bank National Association" with an address in Lewisville, Texas.  The Auditor's "Transfer History" for this property (Exhibit L-3) includes a sale date of January 14, 2008 from previous owners (Ryan Turnley and Tiffany Schulz) to "Wells Fargo Bank National Asso.," which matches the grantor/grantee names on Exhibit L-2.   Exhibit L-4 is a Notice of Civil Offense issued on June 17, 2008 regarding weed control, addressed to Wells Fargo Bank NA at the Lewisville, Texas address.  Exhibit L-5 is a VBML violation notice and letter from the Department of Buildings and Inspections dated February 21, 2008, addressed to Wells Fargo Bank NA TR, c/o Corporation Service Company in Wilmington, Delaware, with a certified mail number stated in the body of the letter.  A similar letter was sent on the same day to Wells Fargo Bank NA TR at the Lewisville, Texas address (with a different certified mail number listed).  Exhibit L-6 is a February 17, 2009 letter from the Division

of Property Maintenance to Wells Fargo Bank NA TR, at the Property Preservation Department, 11200 W. Parkland Avenue (but no city or state).  A copy of the same letter was sent the same day to the Lewisville, Texas address by certified mail.  Exhibit L-7 is an invoice for weed abatement costs for the property, dated September 26, 2008 in the amount of $148.75, and addressed to Wells Fargo Bank NA TR at the Lewisville, Texas address.

Exhibits A through V to the City's motion adhere to this general format, with varying numbers of documents concerning notices and invoices for abatement costs for each property.

In a declaration filed in support of the City's motion, Edward Cunningham (Manager for the City's Code Enforcement Division) states that his department is responsible for enforcement of the City's Building Code and its Vacated Building Maintenance License ("VBML") program.  The City enacted the VBML program to address the increasing number of vacated and blighted properties, and it imposes escalating fees on owners of properties that have been ordered vacated or kept vacant for periods spanning one to five years or more.  If an owner refuses to respond to a VBML notice, the City will erect barricades on the property, and will eventually demolish the structures if and when they pose a danger to the community.  Barricading and demolition are conducted by private contractors hired by competitive bid.  Mr. Cunningham avers that when issuing orders or violation notices, he and his department staff "... rely on the public information that is made available through the Hamilton County Auditor's Office to determine the identity of the property owner and the address at which the owner can be notified of a property code violation."  (Doc. 133-1,

-8-

Cunningham Dec. at ¶31, PAGEID 8401)  He further states that when properties are

owned by financial institutions as trustees, the

> ... names of the actual trusts are not known or readily available to the City
> through the public Auditor's records.  Sometimes, it is not readily apparent
> or known to the City that a property is even held by a bank in its trustee
> capacity.  For example, for many of the properties at issue ..., the
> ownership information available through the Auditor will typically indicate
> the owners as "Wells Fargo," "Wells Fargo, N.A.," "Wells Fargo as Tr," or
> some iteration thereof.

(Id. at ¶¶ 32-33)  When a property is owned by the trustee of a securitization trust, the

City has no way to identify the servicer, because servicers are not identified in the

auditor's records.  (Id. at ¶34)  Cunningham also reviews the history of the VBML

notices and orders, and the barricade invoices that his office generated and sent to

Wells Fargo as trustee for 12 of the properties at issue.  He verifies the copies of those

documents that are included in Exhibits A through V.  (Id. at ¶¶ 12-28) The total amount

of VBML fines sought by the City is $27,700, and the total for barricade costs is

$2,492.81.

The declarations of William Jacoby (the City's Litter Control Division's

Supervising Sanitarian) concerning weed or litter abatement fines and costs (Doc. 134-

1), and of Patricia Sumner (City Solicitor's Office paralegal) concerning unpaid code

violation fines (Doc. 135-1), similarly recite the history of the notices and orders

regarding these types of fees and fines for the properties, as reflected in the documents

included in Exhibits A through V.

Wells Fargo has filed verified copies of Sheriff's deeds for seven of the properties

at issue, together with subsequent warranty or quitclaim deeds when the properties

were sold or transferred to new owners.  (Doc. 139-12, Dunn Dec., Exs. 7-18)  The

-9-

deeds for six properties identify the grantee as Wells Fargo Bank as a trustee of an RMBS trust; the deed for 15 Glen Este Place (Dunn Ex. 7) simply identifies "Wells Fargo Bank, N.A." as grantee.

IV.     Wells Fargo's motion contends that the City's claims against it must be dismissed because the City did not sue the proper entities.  It argues that the City cannot simply sue "Wells Fargo as Trustee."  It must sue Wells Fargo as Trustee **of a specifically identified RMBS Trust** with respect to **each** property.  "Wells Fargo as Trustee" is an entity which does not exist, and which lacks capacity to sue or to be sued.  For similar reasons, Wells Fargo argues that the City lacks standing to sue "Wells Fargo as Trustee" because that non-existent entity has no assets with which to satisfy any judgment that might be granted to the City.  The only entity that could satisfy a judgment is the RMBS trust for which Wells Fargo acts or acted as Trustee with respect to each property.  Wells Fargo argues that the City's failure to sue the proper entity for each property entitles it to entry of summary judgment.

The City argues that its identification of and allegations against Wells Fargo in its capacity as a trustee are more than sufficient to satisfy pleading and standing requirements.  The caption of the Third Amended Complaint identifies "Wells Fargo Bank, N.A., as Trustee for Identified and Unidentified Trust Properties" as the defendant.  (Doc. 112, PAGEID 8198)  Paragraph 8 alleges that "the Wells Fargo, as Trustee, RMBS trust properties that are at issue in this case, and when known, the name of the trust, are identified in Exhibits B, D, F, H and I of the Complaint."  (Id., PAGEID 8200)  The Court notes that those exhibits identify a specific trust for 12 of the

20 properties listed in the City's pending motion.  For example, Exhibit B to the third amended complaint identifies the owner of 15 Glen Este Place as "Wells Fargo as Trustee for Trust AEGIS 2004-4," and identifies the owner of 1875 Westwood Avenue as "Wells Fargo Trustee for BSAB 2005-1."  (Doc. 112-2 at PAGEID 8226)  The owners of the other eight properties are identified as "Wells Fargo, N.A." or "Wells Fargo either individually or as Trustee" when the identities of specific trusts were not known.  But Wells Fargo counters this argument by noting that the names of the specific trusts are stated in the property deeds filed with the County Recorder, and that deeds are the best and most accurate records of property title.  It argues that with minimal effort, the City could have located the trust names and sued Wells Fargo as Trustee of each of those trusts for each affected property.  Wells Fargo therefore discounts the City's reliance on Auditor records, and its contention that the full trust names are not readily available.

The City's inspectors rely on the Auditor's Office records to determine property ownership when issuing citations or pursuing code enforcement actions, as explained by Cunningham.  The Auditor's records do not identify the name of the specific RMBS trust for which Wells Fargo acted as trustee when it became the titled owner of any of the 20 properties.  Neither do the conveyance forms which were completed and filed with the Auditor by an agent of Wells Fargo as Trustee of a trust.  The City contends that imposing a requirement upon its employees to research property deeds in order to ascertain the full name of an RMBS trust each time a code violation notice issues, or an enforcement action is filed, or in preparation for litigation, would be unduly burdensome and resource-prohibitive.  (See Dec. of Patricia Sumner, Doc. 150-4 at ¶6, PAGEID 9775)

At this juncture of the case, the Court finds Wells Fargo's argument to exalt form over substance.  The names of each trust for each of the disputed properties are readily ascertained from Exhibits A-1 to V-1 filed with the City's motion.  Dunn's declaration attached a list of the properties, and he states that Wells Fargo confirmed, based on its own business records, that the properties were held by one of various RMBS trusts for which Wells Fargo served as trustee.  (Doc. 139-12, Dunn Dec. at ¶2, PAGEID 9289) The names of these trusts are clearly known to Wells Fargo, and it makes no claim that it has been misled or unduly prejudiced by the form in which the Third Amended Complaint identified Wells Fargo in its role as trustee with respect to specifically identified properties.  The Court discerns no requirement in Rule 56, or in any pleading rules, that would require the City to draft its complaint to include a separate paragraph identifying Wells Fargo as Trustee for the specific RMBS trust for each property, when the same information can be conveyed in table form.  The Court also rejects Wells Fargo's contention that the City should be required to undertake a search of title deeds, in order to ferret out the name of a particular RMBS trust, before it may proceed in code enforcement litigation.

For the same reasons, the Court finds that the City has standing to sue Wells Fargo as Trustee of various RMBS trusts.  The City's claims related to the remaining 20 properties are clearly asserted against Wells Fargo in that capacity, and the identity of the trusts are known to both parties and to the Court.  Wells Fargo cites hornbook trust law establishing that if it is found liable as a trustee, it may use trust property to discharge that liability (or, as Wells Fargo states it intends to do, seek contractual indemnity from the trusts' servicers).  There is no contention that the City is seeking a

judgment of liability against Wells Fargo in its individual corporate capacity.  The City has standing to sue the owners of properties that are not in compliance with the City's codes and ordinances.  And when such properties are owned and titled in the name of a trust, the proper party to name as a defendant is the trustee, acting in its capacity as such.

V.     Wells Fargo also argues that it never "owned" the properties, and had no duties with respect to maintenance, repairs, or the disposition of any of the trust-owned properties.  The RMBS trusts "owned" the properties, but Wells Fargo argues that the City has failed to sue the "owners" (the individual trusts for each property).  Wells Fargo's duties as a trustee are described in the Pooling & Servicing Agreement ("PSA") that pertains to each RMBS trust.[2]  The PSA's that govern the RMBS trusts place responsibility for property maintenance and upkeep, dealing with borrowers, and enforcing loan agreements, with servicers, different entities from the Trustees.

Kevin Trogdon is a Wells Fargo Vice President in the bank's Corporate Trust Services division.  His declaration, submitted in support of Wells Fargo's motion, states that the remaining disputed properties involve 18 RMBS trusts for which Wells Fargo acted as trustee.  He further states that Wells Fargo, as Trustee, never had physical access to any of these properties.  During the course of this case, Wells Fargo has communicated with the servicers of the trusts regarding the properties identified by the City on multiple occasions about the City's claims.  After the Third Amended Complaint

---

[2] The parties have stipulated to a representative sample of three PSA's, which generally include similar relevant provisions.  See Doc. 139-1, Trogdon Dec., Exs. A, B and C.

was filed, Wells Fargo again communicated with trust servicers for properties that were first identified by the City in that pleading.  Trogdon states that it is his understanding "... that the City has resolved claims as to certain properties with certain servicers, but that the [twenty] properties remaining in dispute under the [Third Amended Complaint] are the ones for which no resolution has been reached."  (Doc. 139-1, Trogon Dec. at ¶14, PAGEID 8825)  Wells Fargo suggests that in view of these facts, the City should simply continue in its efforts to resolve its remaining claims directly with the servicers, instead of choosing to "burden Wells Fargo and this Court with unnecessary litigation."  (Doc. 145 at 7, PAGEID 9479)

However, the City contends that even if it could have identified the servicers from any county records, they are not the real parties in interest to its claims in this case, because they are not the property owners.  Wells Fargo does not suggest a legal basis upon which the City might sue these unknown servicers.  And if the City is unable to resolve its claims with certain servicers (as Wells Fargo's motion suggests is the case with respect to the remaining properties), it is unclear what remedy the City should pursue other than the one it has chosen, to proceed against the Trustee of the trusts that owned the properties.

In denying Defendants' motion to dismiss an earlier version of the City's complaint, this Court noted that the servicers are not identified in any property title documents, and that the PSA's do not confer property ownership on the servicers. (Doc. 61 at 17)  These observations have been borne out by the summary judgment motions and the evidence submitted by both parties.  The PSA's are not recorded in any county office, and are not part of the chain of title of the properties.  The City's municipal

code and VBML ordinances impose duties on property **owners**, not upon parties with whom owners may have contractual relationships regarding property maintenance and upkeep. For the same reason, fines and penalties imposed for property code violations are imposed against property **owners.** Servicers may well have contractual obligations to the trustee, and/or the RMBS trust, its investors and certificate holders. But it is clear to the Court that the servicers are not owners of property, and Wells Fargo does not contend otherwise.

In a housing court case brought by the City of Cleveland against Deutsche National Bank Trust Company, the Ohio Court of Appeals rejected the bank's claim that a trust servicer was liable for housing code violations. In that case, the City had sued Deutsche Bank National Trust Company to recover fees and costs incurred when it demolished a dilapidated and abandoned house. Deutsche Bank moved to dismiss, arguing that it did not own the property and the City failed to identify the specific trust that did own it. The housing court denied that motion, and at a later court hearing, Deutsche Bank's attorney entered a plea on behalf of the bank "as Trustee for Long Beach Mortgage Loan Trust 2003-1." The trial court then entered judgment against Deutsche Bank National Trust Company **individually**, and not against the bank as trustee of the trust.

The Ohio court of appeals vacated that judgment, finding that it should have been entered "against the entity that owns the property. Here, the title clearly shows the property is owned by DBNTC in its capacity as a trustee." City of Cleveland v. Deutsche Bank National Trust Co., 2014-Ohio-1948, at *P15 (Ohio 8th Dist. App., May

8, 2014).  The court also held that Deutsche Bank **as trustee** was responsible for property upkeep, and not the servicer for that specific trust,  because the servicer was not the owner.

Wells Fargo admits that the remaining properties were owned by an RMBS trust, and that it served as Trustee for each of those trusts.  The City did not simply sue "Wells Fargo as Trustee," as it repeatedly contends.  The City's claims were asserted against Wells Fargo as Trustee of specific RMBS trusts; the City identified the names of those trusts if they were known when it filed its Third Amended Complaint.  And the City has identified each of the trusts in its motion for partial summary judgment, by incorporating the orders attached as Exhibits A-1 to V-1 to its motion.  There is no dispute that the City's remaining claims are brought against Wells Fargo as trustee of those trusts.  Wells Fargo's contentions with respect to the issues surrounding its role as Trustee are therefore rejected.

VI.    Wells Fargo's motion further argues that the City has failed to provide sufficient evidence supporting its claims for damages based on code and VBML violations.  In its motion, it contends that there is a lack of evidence regarding three properties: 1805 Denham Street, 1875 Westwood Avenue, and 1915 Rockingham Street.  Wells Fargo asked for all such documentation in discovery, and it contends the City produced nothing to substantiate its claims.   The City responds that five documents concerning these three properties were produced in a supplemental production on January 7, 2016. (See Doc. 146-3, a January 7, 2016 email enclosing 25 bates-numbered documents.) These documents are attached to the City's motion with respect to the three properties, as Exhibits D-4 and D-5, F-4 and F-5, and G-4.  Wells Fargo's reply memorandum does

not dispute the City's contention that these documents were in fact disclosed, and the Court will not grant judgment to Wells Fargo on this basis.

VII.    In its opposition to the City's motion, Wells Fargo more broadly argues that Exhibits A through V submitted by the City in support of its claims in Counts One through Four do not prove that any of the properties were actually in violation of any code provisions.  That is, the City has failed to offer sufficient proof that any of the properties in fact had excess weeds, grass or litter; that the buildings for which barricade orders were issued were in fact dangerous or open to trespassers; or that the VBML properties were in fact vacant or posed a danger to safety when the violation was noted.  It contends that it is not enough for the City's employees (Sumner, Jacoby and Cunningham) to verify that the copies of citations and correspondence attached to the City's motion are "true and correct" copies.  The City must come forward with substantive evidence of the conditions of the properties that the City alleges violated the City's code sections and that warranted imposition of abatement costs, or VBML and code citations.

The City responds that the affidavits of its employees establish that all of the costs and fees for which it seeks judgment were incurred only after: (1) the City received a complaint about the property; (2) a City inspector visually inspected that property and verified the code violation; (3) Wells Fargo was notified of the violation, by posting the notice on the property and by mailing a notice at the owner's address of record listed with the Auditor; (4) Wells Fargo failed to abate the violation in a timely fashion; and (5) the City did so at its expense.  In his second declaration filed with the City's reply, Cunningham explains: "Every notice of violation of the City Building Code

and VBML order that is issued by the City to property owners is first confirmed and verified by City inspectors through one or more site visits to the subject property to determine whether there is an underlying violation." (Doc. 150-1, Cunningham Dec. at ¶9, PAGEID 9581)  Cunningham attaches to this declaration copies of his department's Inspection History Report for 1104 Groesbeck Road, 1847 Hewitt Avenue, 2767 Beekman St., 3735 Cass Avenue, 414 Wade Street, 4141 Langland Street, 4227 Kessler Avenue, 538 Howell Avenue, 5788 Lantana, 608 W. Martin Luther King Drive, 777 Ridgway Avenue, and 927 Sunset Avenue.  If inspectors took photographs of the property (and there is no requirement that they do so), the photos are also attached to Cunningham's declaration.  In at least one case (3735 Cass Avenue), the City filed a criminal case against Wells Fargo as Trustee, records from which are attached as Exhibit 11 to Cunningham's declaration.

William Jacoby's second declaration states that for weeds and litter violations, a similar process is followed.  After a complaint is received, a City inspector visits the property and verifies that a violation exists on the property.  The offense notice is mailed to the owner and posted on the property, giving the owner ten days to abate the violation.  If there is no timely response, the City abates the nuisance and sends the owner an invoice.  (Doc. 150-3, Jacoby Dec. at ¶¶6-7, PAGEID 9773-9774)

The City also contends that Wells Fargo had the opportunity to contest the facts giving rise to the violations at the time the notices were posted or mailed (in some instances, several opportunities).  The City's code provides for administrative appeals of any violation citations.  An initial appeal is before the Board of Housing Appeals, and any civil fines are appealable to the City's Office of Administrative Hearings.  A party

may then seek judicial review of final administrative decisions under Ohio Rev. Code 2506.  Wells Fargo failed to respond to any of the notices for the 20 properties, and the City contends it should be precluded from contesting the merits of them in this case. The City further notes that Wells Fargo does not seriously dispute the merits or the underlying violations, nor offer any evidence suggesting that the properties were in good repair, were not abandoned, or mistakenly cited as violating any code provision.

The Court finds that the City's evidence, specifically the declarations of Cunningham, Jacoby and Sumner, together with the documents attached to the City's motion and their declarations, are sufficient to establish the existence of the violations on the properties.   The declarations show that the City inspectors follow established procedures for inspecting properties and documenting those inspections in the property histories.  Wells Fargo cites no rule requiring the City to produce a witness with personal knowledge of the conditions that existed on each property to testify to his or her personal recollection of any visit to the property, or to verify the accuracy of the observations recorded by inspectors in the normal course of their duties, or in the citations and violations notices issued by the City.  And Wells Fargo had an opportunity to contest the violations when they were issued, and either failed or refused to do so. The Court is satisfied that the City has adequately explained its policies and procedures regarding inspecting and citing properties that are in violation of City codes and ordinances.  The Court is also satisfied that there is nothing in the City's evidence or in Wells Fargo's arguments that suggests a deviation from those normal procedures with respect to any of the 20 properties.

VIII.    Wells Fargo raises a related argument concerning violations pertaining to eleven

-19-

of the properties. It argues that the City has not established that it provided actual notice to Wells Fargo of the violations alleged in Counts Two through Four with respect to these eleven properties at the time the violations were issued. Wells Fargo labels this group the "Unnoticed Violations," and they are listed in Exhibit A to its memorandum in opposition to the City's motion. (See Doc. 145, Ex. A, at PAGEID 9487-9488) Wells Fargo contends that its first notice of these violations came in this lawsuit, either on December 11, 2011 (the City's original complaint, filed in state court and removed to this Court by Defendants) or on May 5, 2015 (the City's Third Amended Complaint). Since this group of violations all occurred more than one year prior to the date of the City's complaints, Wells Fargo then argues that these claims are time-barred under Ohio Rev. Code 2305.11(A), the one-year limitations period for actions brought "upon a statute for a penalty or forfeiture ...". It argues that it is not sufficient for the City to provide copies of letters and correspondence to Wells Fargo. The general "mailbox rule" presumption applies only if the sender has used certified mail, or offers some proof of regular custom and practice regarding use of the U.S. mail.

The City responds that Wells Fargo's lack of notice arguments are meritless. Wells Fargo does not claim that did not actually receive any of the notices or letters attached to the City's motion, nor claim that an incorrect address was used by the City in any of its correspondence.[3] The City relies on the general rule that a letter which is

_____

[3] Cunningham states that a violation notice for 1104 Groesbeck Road was mailed to a wrong address. (Doc. 150-1, 18 at n. 1, PAGEID 9582) That letter (Doc. 138-1, Ex. A-5) was addressed to Kenneth Davenport, the defendant in Wells Fargo's mortgage foreclosure action. But this violation is not on Wells Fargo's list of "Unnoticed Violations," and Wells Fargo's opposition brief cites Exhibit A-5 as one for which the City provided notice to Wells Fargo via certified mail. (Doc. 145 at 11, n.5)

-20-

properly addressed and deposited in the U.S. mail is presumed to have been delivered to its addressee. The declarations of Cunningham, Jacoby and Sumner all attest to the City's regular practice of mailing letters via U.S. mail to property owners at the addresses listed in the Auditor records.

Regarding the specific exhibits listed in Wells Fargo's "Unnoticed Violations" chart:

- **Exhibit C-5** regarding 15 Glen Este Place was addressed to Wells Fargo at the address it listed in Exhibit C-2, the real property conveyance form. The same is true regarding **Exhibits E-4 and E-6**, relating to 1847 Hewitt Avenue. The City's January 18, 2007 VBML violation notice was sent by certified mail to Wells Fargo at the same address, and preceded the invoice that is marked as Exhibit E-4.

- Exhibits **K-8, K-9 and K-10** are three notices and invoices for weed abatement services (two invoices with separate numbers, each in the amount of $174, and a third invoice for $225) for 3733 Cass Avenue. All three are addressed to Wells Fargo at the address it provided on the real property conveyance form (Exhibit K-2). Wells Fargo does not challenge Exhibit K-5, correspondence regarding a litter violation notice that was sent to the same address.

- **Exhibit L-7** is an invoice for weed abatement services, dated September 26, 2008 for 3735 Cass Avenue ($148.75), which was mailed to the address listed on Wells Fargo's real property conveyance form. On July 3, 2008, the City also sent Wells Fargo a final notice of a July 24, 2008 pre-prosecution hearing concerning this property. This notice was sent certified mail and received at that address as evidenced by a return

mail receipt.  (Doc. 150-1, Cunningham Dec., Ex. 10 at PAGEID 9619-9620)

- **Exhibit N-7** is a July 21, 2004 VBML notice concerning 4141 Langland Street. This notice is addressed to Wells Fargo at the address it provided on the real property conveyance form; two subsequent invoices for the barricade costs incurred by the City were sent to the same address, and apparently are not contested.   The City sent subsequent notices of its intent to barricade the property to Wells Fargo, at the same address, on August 25 and September 14, 2004, both sent by certified mail and for which the City submitted return mail receipts.  (Doc. 150-1, Cunningham Dec., Exs. 15 and 16, PAGEID 9661-9664)

- The same pattern exists concerning **Exhibit O-5**, a March 24, 2005 VBML notice concerning 4227 Kessler Avenue.  That notice was sent to the address listed on Wells Fargo's property conveyance form, and the City sent a subsequent notice of intent to barricade on April 26, 2005, which was sent by certified mail and received.  (Doc. 150-1, Cunningham Dec., Ex. 18, PAGEID 9672-9673)

- **Exhibit S-4** concerns 5788 Lantana Avenue, a January 12, 2005 VBML notice the City sent to the address that Wells Fargo listed on its property conveyance form. The City's motion alleges a claim for $600 for VBML fees associated with this property. The January 12 notice does not state the amount of a fee, but Cunningham states that prior to 2006, the City's VBML fee was $300 annually, with a $300 late fee.  (Doc. 133-1, Cunningham Dec. at ¶7, PAGEID 8397)

- **Exhibit T-5**, concerning 608 W. Martin Luther King Drive, is a November 7, 2006 VBML notice addressed to Wells Fargo at the same address Wells Fargo listed in

-22-

its real property conveyance form.   Exhibit T-6 is a follow-up notice (with the same

violation and case number) dated April 3, 2007, sent to the same address by certified

mail, and for which a return receipt was received.  (Doc. 150-2 at PAGEID 9730) The

exhibits to Cunningham's second declaration also include a June 6, 2007 letter from

Wells Fargo's Corporate Trust Services division to Option One in Irvine, California,

enclosing a summons and complaint that had been served on Wells Fargo in the court

case filed by the City involving 608 W. Martin Luther King.  The letter demands that

Option One, as the loan servicer, respond and indemnify Wells Fargo.  (Doc. 150-2 at

PAGEID 9732)  Wells Fargo can hardly claim a lack of notice regarding this property.

- **Exhibit M-4** is a March 12, 2014 VBML notice for 414 Wade Street, addressed

to Wells Fargo Bank NA TR, at the address Wells Fargo provided on the real property

conveyance form.  Similarly, Exhibits **H-6, H-7 and H-8** pertain to 2767 Beekman Street

(a January 14, 2005 VBML notice, and invoices for $90 for weed abatement services

performed on December 4, 2004).  All three were addressed to Wells Fargo at the

address it provided on the property conveyance form, and to which the City mailed civil

offense notices concerning weeds and litter on September 11, 2004 (Exs. H-4 and H-5).

- **Exhibit V-4** is a February 7, 2012 VBML violation notice concerning 927 Sunset

Avenue.  It is addressed to Alexander Okoye, who according to the Auditor's Transfer

History for this property (Exhibit V-3), owned the property until January 21, 2014.  The

court entry confirming the sheriff's sale of the property to Wells Fargo Bank as Trustee

of a specified Bank of America trust (Exhibit V-1) was entered on August 20, 2013.

While Exhibit V-4 includes a violation notice addressed to Wells Fargo at the address

-23-

Wells Fargo provided on the real property conveyance form, the notice is dated February 7, 2012 which precedes the sheriff's sale and the date of the property conveyance form.  Mr. Okoye was apparently the owner of this property at the time the notice was issued, and the City does not explain this discrepancy.

Based on the entirety of the evidence in the record, the Court concludes that the City provided Wells Fargo with adequate and timely notice of the violations and abatement costs incurred by the City with respect to all of these properties **except** 927 Sunset Avenue.

IX. Premised on its lack of notice argument, Wells Fargo also contends that the City's claims with respect to the eleven properties are untimely under the one-year statute of limitations in Ohio Rev. Code 2305.11(A).  That statute applies to actions for libel, slander, malicious prosecution, false imprisonment, and to "an action upon a statute for a penalty or forfeiture."  Wells Fargo argues that the City's claims for VBML fees, barricade costs and weed/litter abatement expenses, are all in the nature of statutory penalties or forfeitures.  The City responds that the proper limitations period is contained in Ohio Rev. Code 2305.07, a six-year period for an action "upon a liability created by statute other than a forfeiture or penalty."

In Rosette v. Countrywide Home Loans, Inc., 105 Ohio St.3d 296 (2005), the Ohio Supreme Court held that Section 2305.07 applied to a claim under Ohio Rev. Code 5301.36(C), which allows a mortgagor to bring a civil action for $250 in statutory damages if the mortgagee fails to timely record a satisfaction of mortgage.  The lower courts found that the statute was penal in nature and applied the one-year statute.  But the Supreme Court disagreed, citing other statutes in which the legislature had clearly

-24-

used the term "penalty" or "forfeit" when it intended to create an action for a penalty or impose a forfeiture. The court noted that a statute is not penal "merely because it imposes an extraordinary liability on a wrongdoer in favor of a person wronged, which is not limited to damages suffered by him." Id. at 299 (internal citations omitted).

The City's claims in this case are not based upon penal statutes. Cunningham explains that the VBML program is required because vacant buildings "... are attractive nuisances to trespassers, vandals and refuge to criminals, are fire hazards, and are frequently broken into and tend to decay rapidly due to lack of on-site management. Inspections also help to ensure that vacated buildings do not pose a risk to health, safety, or welfare of neighboring properties, residents, and emergency responders who may have to enter the building in case of fire, break-ins or squatters." (Doc. 150-1, Cunningham Dec. at ¶5, PAGEID 9580) The imposition of costs and fees to operate this inspection and abatement program is not a "penalty" in the sense used in Section 2305.11(A). Similarly, the recoupment of abatement costs incurred by the City for barricading vacant properties, or for litter, trash and excess weed removal, is not a penalty but is a claim for actual out-of-pocket damages. The Court rejects Wells Fargo's contention that the one-year statute set forth in Section 2305.11(A) applies to the City's claims in Counts One through Four of its Third Amended Complaint.

## CONCLUSION

For all of the foregoing reasons, the Court denies Wells Fargo's motion for summary judgment (Doc. 139). The Court grants in part the City of Cincinnati's motion for partial summary judgment (Doc. 138). The Court concludes that the City is entitled to a judgment against Wells Fargo Bank as Trustee of the specified RMBS trusts

identified in each court entry or order for each of the properties identified in the City's motion (Doc. 138 at pp. 4-7), **except** the claim for VBML fees of $3,700 with respect to 927 Sunset Avenue.

The City did not seek entry of summary judgment on all of its claims, but it appears that the properties at issue in Claims Five and Six (statutory and common law nuisance claims) have been resolved.  A final pre-trial conference is scheduled for June 28, 2016, and the Court believes that a telephone conference with counsel for the parties prior to that date would be of assistance in clarifying if any issues actually remain for trial in this case.  The Courtroom Deputy will contact the parties to schedule that conference in the very near future.

SO ORDERED.

DATED: May 18, 2016                                    s/Sandra S. Beckwith
                                                      Sandra S. Beckwith, Senior Judge
                                                      United States District Court